537 So.2d 1187 (1989)
EADS OPERATING COMPANY, INC., et al.
v.
Honorable Herbert W. THOMPSON, Commissioner of Conservation of the State of Louisiana. (Two Cases)
Nos. 87 CA 1743, 88 CA 1007.
Court of Appeal of Louisiana, First Circuit.
December 20, 1988.
Writ Denied March 3, 1989.
*1188 Patrick S. Ottinger, Lafayette, for plaintiff-appellee Eads Operating Co., Inc., et al.
George Gibson and Darryl J. Hebert, Eunice, for defendant-2nd appellant Herbert W. Thompson.
John A. Gordon, New Orleans, for defendant-appellee Wainoco Oil and Gas Co., and Jones Exploration Co.
Minos D. Miller, III, Edwin Hunter, Lake Charles, for defendants interveners 1st appellants.
Before CARTER, LANIER and LEBLANC, JJ.
CARTER, Judge.
This is an appeal from a trial court judgment granting a motion for summary judgment and determining the entitlement to production proceeds from a producing well known as the Roland Richard No. 1 Well.
Background
On March 19, 1948, owners of leases in the West Tepetate Field, Acadia and Jefferson Davis Parishes, Louisiana, entered into a field-wide unitization agreement. This private contractual agreement was entitled "Unit Operating Agreement" and covered the Miller No. 1 Zone and the Miller No. 3 Zone.[1] The royalty owners in the field entered into a unitization agreement entitled "Royalty Owners Unitization Agreement" on April 1, 1948. The unit created by these agreements, collectively referred to as the "unitization agreements," sought to install and operate a pressure maintenance system for the two reservoirs to maximize production.
Barnsdall Oil Company, designated as operator of the "unit area,"[2] was to maintain *1189 reservoir pressure by injecting water and gas into the previously drilled dry holes or injection wells and to produce through whichever wells were most advantageous to the unit area. All leases in the unit area were pooled and unitized as though only one lease existed, and the unitization agreements provided for division of production according to the equity percentage assigned to each leased tract.[3] The equity percentage values were based upon a determination of the total volume of economically recoverable oil and gas in place in both zones as the zones underlay each leased tract. The unitization agreements also provided that the agreements would remain in full force and effect as long as production is or can be produced in paying quantities in the unit area or any part thereof and until all operations had been abandoned and all materials had been salvaged and divided among the parties in proportion to their interests.
Following lengthy hearings in 1948, the Commissioner of Conservation of the State of Louisiana (Commissioner) issued Order No. 97-A-1, dated May 17, 1948, which provided as follows:
1. That the Miller No. 1 Zone and the Miller No. 3 Zone in the Unit Area of the West Tepetate Field be developed and operated as units and that suitable and proper pressure maintenance operations in each of said pools as a unit be conducted by the operator of the Unit Area.
2. That all separate ownerships in the Miller No. 1 Zone and the Miller No. 3 Zone in the Unit Area of the West Tepetate Field, including perfect ownership, mineral interests, royalty interests, oil and gas leasehold interests, and all other interests relating to or carved out of any of the above are hereby pooled, integrated, and unitized.
3. That the Unit Operation Agreement for Miller No. 1 Zone and Miller No. 3 Zone, West Tepetate Field, dated March 19, 1948, as amended, and the operations and participations set forth in said agreement are hereby approved.
4. That the Royalty Owners Unitization Agreement for Miller No. 1 Zone and Miller No. 3 Zone, West Tepetate Field, dated April 1, 1948, the form of which has been introduced in evidence at this hearing of April 30, 1948, is hereby approved.
5. That operation of the Unit Area as a unit and participation therein as a unit shall be commenced on the 1st day of June, 1948.
6. That all production obtained from all wells in the Unit Area shall be shared by the parties owning interests in the Unit Area in proportion to their respective equity percentages in the Unit Area as set forth in Exhibit "C" attached hereto, incorporated herein, and made a part hereof; provided that as to each leased tract set forth in said exhibit the percentage attributed to said leased tract shall be shared by the owners within the leased tract on an acreage basis unless they shall agree unanimously on a different division of ownership as to said tract. That the allocation of production set forth above will result in the obtaining by each party owning an interest in the Unit Area of his just and equitable share of the oil and gas in place and that may be produced from the Unit Area.
7. That Barnsdall Oil Company is hereby named the Operator of the Unit Area of the West Tepetate Field.
8. That any party or parties owning an oil, gas and mineral lease, or any interest therein, or an unleased tract or *1190 an interest therein, within the Unit Area, who has not become a party to the Unit Operation Agreement of March 19, 1948 as amended, shall not be entitled to any portion of the production from the Unit Area until after the lessees who have executed said Unit Operation Agreement have received from the sale of the production from the Unit Area after the unitization herein provided, a sum equal to all costs incurred in drilling, equipping, and operating all wells, and incurred in the construction, equipment, and operation of the systems for pressure maintenance, plus five per cent (5%) per annum interest, after which such party shall be entitled to receive his proportionate part of the production allocated to the tract in which he owns an interest, after deducting therefrom his proportionate part of all costs incurred in the development, equipment, and operation of the Unit Area.
9. That any party that owns a royalty interest provided in an original lease within the Unit Area who does not execute the Royalty Owners Unitization Agreement of April 1, 1948, shall be entitled to his proportion of the royalties allocated to the leased tract in which he owns an interest and shall be paid in accordance with the terms and provisions of the lease covering the same, and the operator shall account to such party for his proportion of the production in accordance with such party's oil and gas lease contract.
In 1979, Mar-Low, then operator of the unit, discontinued production in the West Tepetate Field, plugged and abandoned the wells, and salvaged the equipment. Mar-Low then cancelled the leases affecting the property. Several months later, Eads Operating Company, Inc. (Eads) acquired mineral leases on lands contiguous to the unit area, affecting lands and minerals underlying a tract known as the Fuselier tract. The Fuselier tract comprised approximately thirty percent (30%) of the Miller No. 1 Zone unit. Eads also acquired other oil, gas, and mineral leases affecting an additional forty percent (40%) of the Miller No. 1 Zone unit.

Facts
In 1982, Eads, as mineral lessee, drilled a well known as the Roland Richard No. 1 Well (the Richard well), in the West Tepetate Field, Jefferson Davis Parish, Louisiana, on certain lands owned by Eads' lessors. The Richard well was drilled on a non-unitized, lease basis in a geological stratum which correlated to the geological stratum of the 1948 unitized well known as the Miller No. 1 Zone.
Upon learning that the Richard well was located within the unit boundaries and had been completed as a producing well in the Miller No. 1 Zone, the Millers[4] made demand upon Eads for their share of the production proceeds attributable to their interests in accordance with the unitizations agreements and the Commissioner's Order No. 97-A-1. The Millers own two tracts of land comprising approximately twenty-five percent (25%) of the lands and minerals affected by the 1948 agreements and order.
On August 7, 1985, Eads[5] filed a petition for declaratory judgment against the Commissioner, alleging among other things, that the unit created by Order No. 97-A-1 *1191 had terminated in 1979 or, alternatively, that the order had no force and effect because the order was issued without statutory authority. The Commissioner answered Eads' petition, denying the allegations. Thereafter, the Millers filed a petition of intervention, seeking to be joined as parties to the litigation. Eads later amended its petition and added numerous other defendants, including the Millers. In its petitions, Eads sought judgment declaring, in pertinent part:
(a) That the Subject [1948] Unit expired and terminated in 1979 and is of no force and effect whatsoever;
(b) That the Richard No. 1 Well has at all times produced and is presently producing on a "lease basis";
(c) That Petitioners are entitled to all production from the Richard No. 1 Well from date of first production and to the proceeds from the sale thereof, subject to the rights of their royalty and overriding royalty owners;
(d) In the alternative, that Order No. 97-A-1 was beyond the statutory or other legal authority of the Commissioner of Conservation and, therefore, illegal, null and void, or, in the further alternative, beyond the jurisdiction of the Commissioner;
(e) In the further alternative, that the Commissioner's Supplement to Order No. 97 dated March 28, 1980, effectively terminated the Subject Unit.
On June 4, 1987, Eads filed a Motion for Summary Judgment.[6] After a hearing based upon the pleadings, affidavits, and requests for admissions, the trial court rendered judgment on August 18, 1987, granting the motion for summary judgment. The trial court then rendered judgment in favor of Eads and against the Commissioner and the Millers, declaring the following:
(a) That each of (1) the Royalty Owners Unitization Agreement for Miller No. 1 Zone and Miller No. 3 Zone, West Tepetate Field, Acadia and Jefferson Davis Parish, Louisiana, dated April 1, 1948, recorded (i) June 29, 1948, in COB 134, Folio 268, under Entry No. 169081, (ii) September 21, 1949, in COB 142, Folio 453, under Entry No. 178587 and (iii) February 6, 1950, in COB 145, Folio 145, under Entry No. 181638, of the public records of Jefferson Davis Parish, Louisiana and (2) the Unit Operation Agreement for Miller No. 1 Zone and Miller No. 3 Zone, West Tepetate Field, Acadia and Jefferson Davis Parish, Louisiana, dated March 19, 1948, recorded April 12, 1948, in COB 132, Folio 237, under Entry No. 167477, of the public records of Jefferson Davis Parish, Louisiana (collectively the "Voluntary Unit Agreement"), terminated in accordance with its express terms and provisions in 1979 and was thereafter of no force and effect whatsoever;
(b) That the Wainoco Oil & Gas Company (formerly Eads Operating Company, Inc.)Roland Richard No. 1 Well, West Tepetate Field, Jefferson Davis Parish, Louisiana, bearing Office of Conservation Permit Serial No. 181082 (the "Richard No. 1 Well"), has at all times produced and is presently producing on a "lease basis";
(c) That Petitioners are entitled to all production from the Richard No. 1 Well from date of first production and to the proceeds from the sale thereof, subject to the rights of their royalty and overriding royalty owners; and
(d) That Office of Conservation Order No. 97-A-1 dated May 17, 1948, effective April 30, 1948, recorded June 18, 1948, in COB 134, Folio 108, under Entry No. 168893, of the public records of Jefferson Davis Parish, Louisiana, did not create or establish any unit, and particularly did not create or establish a reservoirwide or fieldwide unit for the geological *1192 zones described in the aforementioned Voluntary Unit Agreement.
Thereafter, the Millers filed a motion for new trial, urging, alternatively, that the verdict was contrary to the law and the evidence and that the Millers had newly discovered evidence. The Commissioner also filed a motion for new trial, urging that the verdict rendered was contrary to the law and the evidence. By judgment dated September 21, 1987, the trial court denied the Commissioner's motion for new trial.[7]
From the trial court judgment granting Eads' motion for summary judgment and declaratory relief, the Millers and the Commissioner appeal under docket number 87 CA 1743. The Millers assign the following assignments of error:
I. The Trial Court erred in granting the Motion for Summary Judgment.
A. There was a material issue of fact as to whether the Royalty Owners' Agreement had terminated.
B. The Trial Court erred in looking beyond the four corners of the Royalty Owners' Agreement to determine the intent of the parties to the agreement.
C. The Commissioner of Conservation had the authority to form a fieldwide unit for purposes of secondary recovery in 1948.
D. The Trial Court erred in holding that the purpose of Order No. 97-A-1 was merely to bless the Royalty Owners' Agreement.
II. The Trial Court erred in failing to grant a new trial since the holding that the Commissioner of Conservation did not have authority in 1948 to issue Order 97-A-1 which created a fieldwide unit was contrary to the law and evidence.
III. It was an abuse of discretion to assign all costs of this proceeding against the Millers.
The Commissioner assigns the following errors:
1. The Lower Court erred in determining that Commissioner's Order No. 97-A-1 was outside of the scope of the authority of the Commissioner of Conservation at the time of its issuance in 1948.
2. The Lower Court erred in concluding that Commissioner's Order No. 97-A-1 "merely blessed" the voluntary unitization agreement since Order No. 97-A-1 by its own terms creates the unit in question in no uncertain terms and was preceded by proper notice and hearing and all other necessary procedures.
3. The Lower Court erred in finding that Commissioner's Order No. 97-A-1 was not issued in furtherance of the Commissioner's duty to prevent waste of the State's natural resources and was not a valid exercise of the Commissioner's authority under Article 6, Sec. 1(C) of the Constitution of 1921.
4. The Lower Court erred in finding that no issue of material fact was presented at the hearing on the Motion for Summary Judgment.
5. The Lower Court erred in failing to recognize that Commissioner's Order No. 97-A-1 was a valid exercise of the Commissioner's authority in creating a fieldwide unit for the purpose of pressure maintenance or secondary recovery operations.
On or about February 2, 1988,[8] Wainoco Oil and Gas Company and Jones Company (Wainoco), original petitioners in the declaratory judgment, filed a motion for summary judgment.[9] By judgment, dated March 25, 1988, the trial court rendered judgment granting Wainoco's motion for summary judgment and rendered judgment on the petition for declaratory judgment. The *1193 judgment made the identical declarations as the judgment previously rendered in favor of Eads.
From this adverse judgment, the Millers and the Commissioner appeal under docket number 88 CA 1007. The Commissioner did not file an additional appellate brief in this appeal, but merely adopted the brief filed in the earlier appeal. The Millers assign the following errors:
I. The Trial Court erred in granting the motion for Summary Judgment.
II. The Trial Court erred in holding that Commissioner's Order 97-A-1 was invalid or issued without authority.
III. The Trial Court erred in failing to consider Order 97-A-1 as a "cycling" or "recycling" Commissioner's Order.
IV. The Trial Court erred in holding that the ROUA [Royalty Owners Unitization Agreement] terminated under its own terms.
V. The Trial Court erred in assessing all costs against Intervenors Appellants, Millers.
On June 21, 1988, the Millers filed a Motion for Consolidation, Preferential Fixing, and Oral Argument. By judgment dated June 30, 1988, the appeals were consolidated.[10]

Motion for Summary Judgment
The primary issue on appeal is whether the movers carried their burden of showing that there were no genuine issues of material fact and that movers were entitled to judgment as a matter of law.
LSA-C.C.P. art. 966 provides:
A. The plaintiff or defendant in the principal or any incidental action, with or without supporting affidavits, may move for a summary judgment in his favor for all or part of the relief for which he has prayed. The plaintiff's motion may be made at any time after the answer has been filed. The defendant's motion may be made at any time.
B. The motion for summary judgment shall be served at least ten days before the time specified for the hearing. The adverse party may serve opposing affidavits prior to the date of the hearing. The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to material fact, and that mover is entitled to judgment as a matter of law.
C. A summary judgment may be rendered on the issue of liability alone although there is a genuine issue as to the amount of damages.
Summary judgment may not be granted if there exists any real doubt as to the existence of a genuine issue of material fact. Vermilion Corporation v. Vaughn, 397 So.2d 490 (La.1981); American Bank and Trust Company v. Sunbelt Environmental Systems, Inc., 451 So.2d 1111 (La. App. 1st Cir.1984). In other words, a motion for summary judgment should be granted if, and only if, the pleadings, depositions, answers to interrogatories, admissions on file, together with the affidavits, if any, show that there is no genuine issue as to material fact and that the mover is entitled to judgment as a matter of law. Swindle v. Haughton Wood Company, Inc., 458 So.2d 992 (La.App. 2nd Cir.1984); Bartlett v. Calhoun, 430 So.2d 1358 (La.App. 3rd Cir.1983), writ denied, 438 So.2d 575 (La. 1983); Jones v. Prudential Insurance Company of America, 415 So.2d 223 (La. App. 2nd Cir.1982); Jewell v. Thompson, 386 So.2d 689 (La.App. 3rd Cir.1980), writ denied, 393 So.2d 746 (La.1980).
The burden of proof in a motion for summary judgment is on the mover to establish that there are no genuine issues of material fact. This burden is a great one. Only when reasonable minds must inevitably concur is a summary judgment warranted, and any doubt should be resolved against the granting of summary judgment *1194 and in favor of a trial on the merits. Sanders v. Hercules Sheet Metal, Inc., 385 So.2d 772 (La.1980); American Bank and Trust Company v. Sunbelt Environmental Systems, Inc., supra. In short, a summary judgment is no substitute for a trial on the merits. Swindle v. Haughton Wood Company, Inc., supra; Hebert v. Vice, 413 So.2d 342 (La.App. 3rd Cir.1982).
A fact is material if its existence or nonexistence may be essential to plaintiff's cause of action under the applicable theory of recovery. Facts are "material" if they potentially insure or preclude recovery, affect the litigants' ultimate success, or determine the outcome of a legal dispute. Swindle v. Haughton Wood Company, Inc., supra; Sanders v. City of Blanchard, 438 So.2d 714 (La.App. 2nd Cir.1983).
In the instant case, the summary judgment was properly granted only if there are no genuine issues of material fact considering the pleadings and other documents of record. LSA-C.C.P. art. 966. In their pleadings, Eads and Wainoco allege that the unitization agreements had terminated under their own provisions and that Order No. 97-A-1 was beyond the authority of the Commission and, as such, was without effect. Determinations of whether the unitization agreements terminated under their own provisions and whether Order No. 97-A-1 was without effect are dependent upon certain factual findings.
A. Termination of unitization agreements
The "Royalty Owners Unitization Agreement," executed on April 1, 1948, provided for termination of the agreement in paragraph XI as follows:
A. The unitization and unit operation provided by this agreement shall go into effect on the 1st day of June, 1948, and this agreement shall continue in full force and effect as long as production is or can be produced in paying quantities in the Unit Area or any part thereof, and until all unit operations have been abandoned and all materials have been salvaged from the premises and divided among the Operating Lessees in proportion to their respective interests thereto, subject, however, to the rights of lessees to cancel as provided in "B" hereinafter.
Similarly, the "Unit Operating Agreement," executed on March 19, 1948, provided for termination of the agreement in Paragraph XIV as follows:
This agreement shall be effective as of the 1st day of the calendar month following the month in which this agreement has been executed by the owners of the oil and gas leases covering as much as ninety-five per cent (95%) of the equity percentage in the Unit Area. It shall remain in full force and effect as long as production is or can be produced in paying quantities in the Unit Area or any part thereof, and until all operations herein have been abandoned and all the materials have been salvaged and divided among the parties hereto in proportion to their respective interests herein.
Under the clear wording of these provisions, the agreements would not terminate (1) as long as production is or can be produced in paying quantities in the unit area or any part thereof and (2) until all operations have been abandoned and all materials have been salvaged and divided among the parties. It is undisputed that all operations in the unit area were abandoned in 1979 and that all materials were thereafter salvaged and divided by the parties. However, the record leaves for resolution genuine issues of fact pertaining to whether production "is or can be produced in paying quantities" in the unit area.
In requests for admissions, both Eads and Wainoco admit that the Richard Well is currently producing from the geological strata correlative to the Miller No. 1 Zone. The affidavit of Ruffin T. Lowry, President of Mar-Low, stated in pertinent part:
4. All production from the 1948 Unit ceased and terminated in the year 1979. As evidence of such fact of cessation and termination of unit production, all Oil, Gas and Mineral Leases which originally covered and affected lands within the 1948 Unit were released by Mar-Low, the last operator of such 1948 Unit, in July, 1979. There is attached hereto as *1195 Exhibit "A" a certified copy of the aforementioned Release of Oil, Gas and Mineral Leases dated July 5, 1979, recorded July 6, 1979, in COB 466, Folio 165, under Entry No. 417095, of the public records of Jefferson Davis Parish, Louisiana.
5. After and as a consequence of the abandonment of the operation of Mar-Low in the West Tepetate Field, all materials in connection with the operation of the 1948 Unit were salvaged and divided among the working interest owners thereof in proportion to their respective interests thereto and a final accounting among the working interest owners was had.
The affidavits submitted by the Millers, however, address the factual question of production in paying quantities. The affidavit of one of the Millers, Minos D. Miller, Jr., stated, in pertinent part, that:
Production of oil in paying quantities was obtained within the productive limits of the Miller One Zone from the Roland Richard No. 1 Well [on unit tract 38-17] within twenty-nine (29) months after Liskow & Lewis dismissed their application for termination of Order No. 97-A-1 insofar as the Miller One Zone was concerned. Said well has produced over 70,000 barrels of oil from the Miller One Zone and continues to produce oil from the Miller One Zone. These facts conclusively establish to affiant, that production from the Miller One Zone "can be" produced in paying quantities from a part of the Unit.
The affidavit of Frank A. Cormier, President of Frank A. Cormier & Associates, Inc., a professional petroleum engineering and management firm, stated in pertinent part:
10. He has reviewed all available drilling, production and operating data relating to the Roland Richard, et al No. 1 Well.
11. It is his opinion that as a result of injection of water in the wells located within the southern part of the unit area in the Miller No. 1 Zone, oil which would otherwise have been recovered underlying those southern tracts, including intervenor-defendants tract, was swept to the north to the location of where the Roland Richard, et al No. 1 well is currently producing.
12. It is his opinion that the Roland Richard, et al No. 1 Well is producing from the Miller No. 1 zone as defined by Department of Conservation Order No. 97-A-1, the Unitization Agreement and the Royalty Owners Unitization Agreement.
13. It is his opinion that the Miller No. 1 Zone did not cease to be productive in paying quantities in 1979 and could have been produced in paying quantities from 1979 through the time that the Roland Richard, et al No. 1 Well was drilled and produced from the Miller No. 1 Zone.
14. It is his opinion that it is self-evident that because production is now being obtained from the Roland Richard, et al No. 1 Well from the Miller No. 1 Zone that the Miller No. 1 Zone not only can be produced in paying quantities, but is being produced in paying quantities pursuant to the terms of the Royalty Owners Unitization Agreement and the Unitization Agreement.
John Briscoe, a property owner whose property lies within the Miller No. 1 Zone, gave an affidavit. The affidavit stated, in pertinent part:
On October 25, 1979, I granted an oil gas and mineral lease affecting the above described property [which property is a portion of Tract # 25-7 in the Miller # 1 Zone] to Michael F. Miley Oil Properties, Inc. That lease was recorded in Jefferson Davis Parish Conveyance Book 475, p 612, bearing file # 420386. This lease to Michael F. Miley Oil Properties, Inc. covered all of my property which lies within the Unit area of the Miller No. 1 Zone. By assignment dated February 18, 1980, and recorded in JD Conv Bk 480, p 393, bearing file # 421921, this lease was transferred from Michael F. Miley Oil Properties, Inc. to Wainoco Oil & Gas Company [75%] and to Jones Exploration Company [25%].

*1196 As of May 28, 1985, the October 27, 1979 lease had expired by its own terms and I made written demand of Wainoco Oil & Gas Company and Jones Exploration Company seeking a cancellation or release of the oil gas and mineral lease granted to Michael F. Miley Oil Properties, Inc. As of this date, these two companies maintain their claim to hold said lease as to the Miller # 1 Zone which they described as:
"... their interest in the statigraphic equivalent of the interval of sands or formations found between the electric log depths of 8,420 and 8,500 feet in the Barnsdall Oil Company, et al, Minos Miller # 1 Well in Section 38, Township 7 South, Range 3 West."
These two companies seem to contend that the lease I granted to Michael F. Miley Oil Properties, Inc. is being held by production from the Miller # 1 Zone. They have not paid any royalties, shut-in royalties or rentals to me subsequent to the expiration of the primary term of the October 27, 1979 lease.
In opposition to Eads' and Wainoco's motions for summary judgment, the Millers also submitted the affidavit of Fred A. Stolzle, a former employee of Barnsdall Oil Company, who stated, in pertinent part, that:
My duties were maintenance of the production equipment. This included field work at the well heads of all wells in the field. On a few occasions I would gauge tanks. I knew that the principal West Tepetate production came from the Miller One and Three Zones. I knew that salt water was being injected into those zones from the southern part of the Miller leases.
The Joseph Fuselier tract was the northernmost tract in the West Tepetate Field and the Miller tracts were just south of it. While I was working on the north tract, Hobson Mann talked to me about future production from the West Tepetate field. He told me that waterflooding from below the Miller 1 & 3 Zones, and the gas injection from above had increased the amount of oil recovery from the main production Zones, the Miller One & Three Zones; that the manner in which that increase in production of oil had been obtained was by waterflooding and injection of gas. Two salt water injection wells were on the south part of the Miller tract and most of the production from the Miller One and Three Zones came from the north tract. Hobson Mann told me that when production could no longer be obtained from the producing wells and when the field is abandoned, production could be obtained from those zones by drilling a new well on the north tract at a point between the then producing wells on the north tract.
Whether the unitization agreements terminated under their own terms is dependent upon whether, when operations in the unit area ceased in 1979, "production is or can be produced in paying quantities," which is a factual matter. A review of the pleadings, admissions on file, and affidavits show that there is genuine issue of material fact regarding this issue.
B. Effect of Order No. 97-A-1
In their pleadings, Eads and Wainoco contend that the Commission was without authority to issue any order establishing a fieldwide unit. Eads and Wainoco reason that Order No. 97-A-1 merely "blessed" the conventional unit established by the unitization agreements. As such, Eads and Wainoco contend that it was unnecessary for the Commissioner to order the termination of the unit because he lacked authority to create it. Eads and Wainoco contend that, in effect, the Commissioner, in issuing Order No. 97-A-1, was regulating secondary recovery operations within the unit, which was within his authority, but that the order did not create a unit.
The Commissioner and the Millers denied Eads' and Wainoco's allegations and contend that the creation of the unit pursuant to Order No. 97-A-a was a valid exercise of the Commissioner's authority to prevent waste.
In issuing Order No. 97-A-1 in 1948, the Commissioner made the following findings after a public hearing:

*1197 1. That special rules and regulations are required for the Miller No. 1 Zone and the Miller No. 3 Zone in the West Tepetate Field as being reasonably necessary in order to regulate secondary recovery methods, including the introduction of gas and water into said zones, in order to prevent waste of oil and gas as defined by law, to avoid the drilling of unnecessary wells, to obtain the greatest ultimate recovery of oil and gas, and otherwise to carry out the laws of the State.
2. That the West Tepetate Field includes both the Miller No. 1 Zone and the Miller No. 3 Zone, which are proved sources of supply of oil and gas and each of said zones has been extensively developed so that relatively complete information has been obtained and presented to the Conservation Commissioner as to the productive area in each of said zones and the reserves of production in place in each of said zones and in each and every leased tract therein.
3. That all of the productive area of the Miller No. 1 Zone and of the Miller No. 3 Zone in the West Tepetate Field is embraced within the area described above.
4. That the Miller No. 1 Zone and the Miller No. 3 Zone in said Unit Area each is a continuous sand body underlying the field and said sand bodies have good porosity and good permeability and good transmissibility of pressure. No faulting affecting said bodies has been found to exist within the productive area of said Unit Area, and each of said sand bodies constitutes a single and complete pool and reservoir that is suitable for pressure maintenance through the injection of water and the injection of gas in each of them in a proper manner.
5. That Barnsdall Oil Company has been the operator of the greater portion of the West Tepetate Field since it was discovered and as such has, pursuant to approval by the Commissioner of Conservation, conducted operations of a limited nature in the injection of gas into the gas cap of the Miller No. 1 Zone and in the injection of water into the lower portion of the Miller No. 1 Zone and of the Miller No. 3 Zone. Such operations have demonstrated conclusively that each of said zones is suitable for pressure maintenance operations by such injection and that material benefits to each of said pools and to the owners of the separate tracts in the Unit Area have resulted from such pressure maintenance operations. It has been demonstrated conclusively by said limited operations that the pressure in each of said reservoirs cannot be maintained adequately for each of said entire pools unless these operations be carried on in a more complete and comprehensive manner, and that if such full-scale operations are put into effect said pools should be operated as a unit so that injections may be made at the proper points and production may be had from the most suitable wells for the benefit of the pools as a whole, and it will be necessary that said pools be unitized and the separate ownerships therein be integrated in order that, each owner of an interest in the tracts within the pools may receive his just and equitable share of the production.
6. That it is necessary, in developing and operating the Miller No. 1 Zone and the Miller No. 3 Zone in the Unit Area, to pool and unitize the separate ownerships in the Unit Area and to operate the Unit Area as a unit in order to prevent waste, to protect correlative rights, to gain the greatest ultimate recovery of oil and gas, to have the greatest efficiency, and to avoid the drilling and operation of unnecessary wells.
7. That sufficient wells for determining, within reasonable limits of accuracy, the amount and value of the oil and gas in place under each of the respective leased tracts within the Unit Area have been drilled and the Unit Area, as defined, is based upon a reasonable interpretation of the data so obtained.
8. That the owners of oil and gas leases covering over ninety-nine per cent (99%) of the oil and gas in place under the Unit Area have executed an agreement dated March 19, 1948, entitled *1198 "Unit Operation Agreement for Miller No. 1 Zone and Miller No. 3 Zone, West Tepetate Field, Acadia and Jefferson Davis Parishes, Louisiana," a true copy of which agreement and the amendment thereto dated March 27, 1948 has been introduced in evidence at this hearing of April 30, 1948. That the parties to said agreement as amended have agreed to unitize and pool their respective interests in the Unit Area (which is identical with the Unit Area covered by this order), and have agreed upon a suitable formula for determining the percentage values of the Unit Area and of each leased tract designated therein, which formula is fair and appropriate. The parties in said agreement also have defined and described the respective leased tracts and have specified for each of them an agreed equity percentage. Said equity percentages have been computed by efficient, scientific, equitable and fair methods, and the owners of each leased tract have been allocated their just and equitable share of all the oil and gas in place under their respective tract in the Unit Area. Said leased tracts and the equity percentages attributed to each of them in said Unit Operation Agreement of March 19, 1948 are identical with the leased tracts and equity percentages attributed thereto attached to this order, made a part hereof, and marked Exhibit "C". The parties executing said agreement have appointed Barnsdall Oil Company as operator of the Unit Area under terms that are fair, suitable, and equitable. Said agreement of March 19, 1948 is fair and reasonable and suitable for the operation of the Unit Area.
9. That a form for royalty owners agreement dated April 1, 1948, entitled "Royalty Owners Unitization Agreement for Miller No. 1 Zone and Miller No. 3 Zone, West Tepetate Field, Acadia and Jefferson Davis Parishes, Louisiana," has been prepared after discussions by the representatives of the lessees with numerous royalty owners, has been executed by a number of royalty owners, and is now being circulated for execution. A copy of said form for royalty owners agreement has been introduced in evidence as this hearing of April 30th and reference is hereby made thereto. In said agreement the Unit Area, the leased tracts, and the equity percentages attributed to said leased tracts are identical with the Unit Area, leased tracts, and equity percentages set forth in the Unit Operation Agreement of March 19, 1948, as amended, between the lessees, and the operation of the Unit Area provided in said lessees agreement is authorized. Said royalty owners agreement is fair and equitable and appropriate.
10. That in computing the equity percentage values mentioned above for the Unit Area as a whole, the equity percentage of each leased tract in the Unit Area was first computed for each reservoir or pool separately. After said computation of the equity percentages of the leased tracts in each pool separately, the equity percentage values of the leased tracts in both pools combined were then taken as a whole and the equity percentages in both pools combined were attributed to the respective leased tracts.
11. That said unit operations and participations should be commenced at the nearest practical date, which the undersigned Commissioner finds to be June 1, 1948.
The record reveals a genuine issue of material fact as to whether the Commissioner, in issuing Order No. 97-A-1, did so pursuant to his authority to prevent waste, some other valid exercise of his authority, or without any authority. The resolution of this issue is dependent upon numerous factual determinations presently controverted. A thorough review of the pleadings, affidavits, requests for admissions, and other documents of record show that these factual issues remain unresolved.
C. Propriety of Granting the Motion for Summary Judgment
We find that the summary judgments granted in the instant case are improper. This conclusion is bolstered by the principle that the court, in considering a motion for summary judgment, should resolve every reasonable doubt against the mover. Oiler v. Sharp Electric, Inc., 451 So.2d 1235 (La.App. 4th Cir.1984), writ denied, *1199 457 So.2d 1194 (La.1984). We find that the questions of whether the unitization agreements terminated under their own terms or whether Order No. 97-A-1 was without effect are dependent upon certain factual determinations. The record leaves for resolution genuine issues of material fact pertaining to these issues.
A summary judgment is not to be used as a substitute for a trial on the merits. The court should not seek to determine whether it is likely the mover will prevail on the merits, but whether there is an issue of material fact. Frye v. Texas Brine Corporporation, 425 So.2d 310 (La.App. 3rd Cir.1982). The trial court erred in granting Eads' and Wainoco's motions for summary judgment.
Because of our determination that the motions for summary judgment were improperly granted, we find it unnecessary to address the other issues raised by the parties.

CONCLUSION
For the above reasons, the summary judgments granted in favor of Eads and Wainoco, granting declaratory relief, are reversed and set aside. The case is remanded to the trial court. Costs of this appeal are assessed against Eads and Wainoco, with the assessment of other costs to await a determination on the merits.
REVERSED AND REMANDED.
NOTES
[1] The Miller No. 1 Zone and the Miller No. 3 Zones were separate reservoirs, and numerous well were required for their development.
[2] The "unit area" was defined in the unitization agreements, in pertinent part, as:

[T]he Miller No. 1 Zone and Miller No. 3 Zone lying within the productive portions of Sections 25, 35, 36, 38 and 39, Township 7 South, Range 3 West; and of Section 31, Township 7 South, Range 2 West, in Acadia and Jefferson Davis Parishes, Louisiana, and including all the area described in Exhibit "A" hereto attached and made a part hereof, and including all the area fully outlined by the hatched line on the plat annexed hereto, made a part hereof, and marked Exhibit "B".
[3] The "leased tract" was defined in the unitization agreements, in pertinent part, as:

[A] tract of land within the Unit Area upon which any one or more of lessees own the rights to search for production; provided that if said tract, or any part thereof, has been included in a drilling unit established by the Commissioner of Conservation and containing separate tracts of land that have been pooled by order of said Commission or by declaration of pooling, then said drilling shall be considered as a "Leased Tract."
[4] "The Millers" collectively refers to the following parties:

The Minos D. Miller Sr. Trust, through its Trustees, Minos D. Miller, Jr., Ruth Loyd Miller and Edwin K. Hunter; Ruth Loyd Miller, James Valcour Miller, Bonner Miller Hunter, Minos D. Miller, III, Edwin K. Hunter as Trustee of the Adele Hunter Trust, Edwin K. Hunter as Trustee of The Edwin F. Hunter, III Trust, Minos D. Miller, III as Trustee of The Sara Miller Trust, and Minos D. Miller, III as Trustee of the Colin B. Miller Trust.
[5] The following petitioners joined Eads in the suit for declaratory judgment: Wainoco Oil & Gas Company, Murchison Oil & Gas, Inc., Jones Company (sometimes doing business as Jones Exploration Company), William Anderson, Bufler & Bufler Construction Company, Claude Bufler, Glenn Bufler, Davis Crude, Inc., John Eads, Ralph Eads, Ralph Eads, III, James Garrity, Martin L. Key, Mineral Projects, Inc., Jim Olafson, Harry Ollinger, Pollution Control Systems, Inc., Eugene M. Peeples, IV, Retha Peterson, Dr. George Roland, Richard Stroud, Western State Bank, and Sam Yager.
[6] All petitioners, except Wainoco Oil & Gas Company and Jones Company, joined Eads in the motion for summary judgment.
[7] The record is devoid of any ruling on the Millers' motion for new trial.
[8] The exact date of the filing of the motion for summary judgment by Wainoco Oil and Gas Company and Jones Company is not determinable from the record because the original motion could not be located and was not made a part of the appellate record. However, a copy of the motion appears in the record and is dated February 2, 1988.
[9] See footnotes 5 and 6, supra.
[10] The issues raised in each appeal by the Commissioner and the Millers are the same. For purposes of clarity and brevity, we will address the issues raised in each appeal by both parties collectively.