I2CARTER, Judge.
This is an appeal from a trial court judgment in a suit for declaratory judgment for a determination of the entitlement to production proceeds from a producing well known as the Roland Richard No. 1.

BACKGROUND

A full and complete recitation of the background and facts giving rise to the instant suit for declaratory judgment is set forth in this court’s previous opinion in Eads Operating Company, Inc. v. Thompson, 537 So.2d 1187 (La.App. 1st Cir.1988), writ denied, 538 So.2d 614 (La.1989), which we adopt as our own as though fully incorporated in this opinion.
In our prior opinion, we reversed two trial court judgments granting the petitioners’ motions for summary judgment and remanded the matter to the trial court for further proceedings. On remand, the trial of the merits was conducted. Thereafter, the trial court rendered judgment granting a declaratory judgment in favor of the petitioners and all other constituent members of the Committee of Unit Opponents and against the Commissioner, Intervenors, and all other constituent members of the Committee of Unit Proponents. In his oral reasons for judgment, the trial judge determined that the unitization agreement was terminated under the terms of the termination clauses by the plugging, abandonment, and salvaging of the equipment. Moreover, the trial judge determined that the Commissioner did not have the authority to create compulsory fieldwide units prior to Acts 1960, No. 441. Accordingly, in his written judgment, the trial judge made the following declarations:
1. That each of (1) the Royalty Owners Unitization Agreement for Miller No. 1 Zone and Miller No. 3 Zone, West Tepe- *950 tate Field, Acadia and Jefferson Davis Parish, Louisiana, dated April 1, 1948, recorded (i) June 29,1948, in COB 134, Folio 268, under Entry No. 169081, (ii) September 21, 1949, in COB 142, Folio 453, under Entry No. 178587 and (iii) February 6, 1950, in COB 145, Folio 145, under Entry No. 181638, of the public records of Jefferson Davis Parish, Louisiana and (2) the 13Unit Operation Agreement for Miller No. 1 Zone and Miller No. 3 Zone, West Tepe-tate Field, Acadia and Jefferson Davis Parish, Louisiana, dated March 19, 1948, recorded April 12, 1948, in COB 132, Folio 237, under Entry No. 167477, of the public records of Jefferson Davis Parish, Louisiana (collectively the “Voluntary Unit Agreement”), terminated in accordance with its express terms and provisions no later than 1979 and was thereafter of no force and effect whatsoever;
2. That Wainoco Oil & Gas Company (formerly Eads Operating Company, Inc.)— Roland Richard No. 1 Well in Section 31, Township 7 South, Range 7 West, West Tepetate Field, Jefferson Davis Parish, bearing Office of Conservation Permit Serial No. 181082 (the “Richard No. 1 Well”), has at all times produced on a “lease basis”;
3. That Plaintiffs are entitled to all production from Richard No. 1 Well from date of first production and to the proceeds from the sale or other disposition thereof, subject to the rights of their royalty and overriding royalty owners; and
4. That Office of Conservation Order No. 97-A-l dated May 17,1948, effective April 30, 1948, recorded June 18, 1948, in COB 134, Folio 108, under Entry No. 168893, of the public records of Jefferson Davis Parish, Louisiana, did not create or establish any unit, and particularly did not create or establish a reservoirwide or fieldwide unit for the geological zones described in the aforementioned Voluntary Unit Agreement.
From this adverse judgment, Intervenors appeal assigning the following errors:[1]
1. The trial court erred in finding that the Louisiana Commissioner of Conservation was without statutory or other legal authority to create a compulsory reservoir-wide unit for the Miller No. 1 and No. 3 zones of the West Tepetate Field by the issuance of Order No. 97-A-l.
2. The trial court erred in not recognizing and according great weight to the consistent and long term interpretation by Commissioners of Conservation of their unitization authority under Act 157 of 1940.
3. The trial court erred in failing to recognize that the Commissioner of Conservation had jurisdiction for reservoir-wide multi-well unitization at the West Tepetate Field under the specific provisions of Act 157 of 1940 related to gas recycling.
U4. The trial court erred in determining that any claim of the invalidity of a Commissioner order as being in excess of his statutory authority has not long prescribed.[2]
5. The trial court erred in its apparent determination that Order No. 97-A-l did not, by its explicit terms, unitize all ownerships within the unit area but only “blessed” a private agreement.
6. The trial court erred in accepting opinion testimony of appellees’ legal experts who had no pre-1960 fieldwide unitization experience over that of the executive assistant to Commissioner McHugh who worked with oil and gas attorneys throughout the State at the time of the issuance of Order No. 97-A-l.
*951 7. Although irrelevant to the issue presented on this appeal, of whether the reservoir-wide unit for the Miller No. 1 zone established by Order No. 97-A-l had terminated prior to the drilling of the Roland Richard No. 1 well, the trial court erred in determining that the private royalty owners agreement terminated with the plugging and abandonment of wells in 1979.

UNITIZATION AUTHORITY OF THE COMMISSIONER PRIOR TO 1960

Article 6, Section 1C of the Louisiana Constitution of 1921 established the Department of Conservation. All natural resources, other than wildlife, fisheries, and forestry, were placed under the jurisdiction of the Department of Conservation. The Constitution also provided that the Commissioner “shall have and exercise such authority and power as may be prescribed by law in relation to all other natural resources of the State.” LSA-Const. of 1921, Article 6, § 1C.
The use of the phrase “as may be prescribed by law” in Article 6, Section 1C evinces the clear intent by the drafters of the constitution to allow the legislature to frame the authority of Isthe Commissioner relative to all natural resources, other than wildlife, fisheries, and forestry.' In Hayden v. Louisiana Public Service Commission, 553 So.2d 435, 439 (La.1989), the Louisiana Supreme Court interpreted a constitutional provision relative to the Public Service Commission. The court noted that “[b]y using the phrase ‘as provided by law,’ the drafters of the constitution intended to allow the legislature to frame its grant of ‘other regulatory authority.’ ”
Moreover, the conclusion that the intent of the drafters of the constitution was to permit the legislature to frame the authority of the Commissioner relative to all other natural resources is consistent with the language contained in Section ID of Article 6 of the Constitution of 1921, which expressly gave the legislature the power and authority to amend any existing law and to enact all laws necessary to protect, conserve, and replenish the natural resources of the state and to prohibit and prevent the waste or any wasteful use of such natural resources.
Generally, the power of any administrative officer or agency to take valid action is conditioned upon first establishing that the action to be taken falls within the legislative grant of authority. Hunter v. Hussey, 90 So.2d 429, 436 (La.App. 1st Cir.1956). Therefore, in order to be valid, the actions of administrative agencies must be taken in accordance with valid legislative authority. Considering the above, we find that the Commissioner of Conservation has only those powers expressly granted to him by the legislature. Absent a grant of authority by the legislature, the Commissioner is without authority to act.
Pursuant to its power to enact all laws necessary to protect, conserve, and replenish the natural resources of the state and to prohibit and prevent the waste or any wasteful use of such natural resources, in 1940, the legislature enacted Act 157. The orders of the Commissioner under consideration were issued pursuant to the authority of the Commissioner under Act 157 of 1940. | (¡Therefore, we must look to the provisions of Act 157 of 1940 to determine the extent of the authority granted to the Commissioner.
Intervenors contend that the Commissioner was authorized to force pool the Miller No. 1 and 3 zones. In support of this position, Intervenors rely on Section 3 of Act 157 of 1940.
In Section 3 of Act 157 of 1940, the legislature granted the Commissioner jurisdiction and authority of and over all persons and property necessary to enforce effectively the provisions of the Act and any other Acts relating to the conservation of oil or gas. Section 3 also granted the Commissioner the general authority and duty to make inquiries as he may think proper to determine whether or not waste, over which he has jurisdiction, exists or is imminent. In the exercise of this general power, the legislature authorized the Commissioner to collect data, to make investigations and inspections, to examine properties, leases, and records, to examine oil and gas wells and tanks, to hold hearings, to provide for the keeping of records, and to take such action as may reasonably appear to him to be necessary to enforce the Act. Fur *952 ther, Section 3 granted the Commissioner the specific authority to make rules, regulations, or orders for certain purposes, including the following:
(c) To prevent wells from being drilled, operated and produced in such a manner as to cause injury to neighboring leases or property.
[[Image here]]
(j) To regulate secondary recovery methods, including the introduction of gas, air, water, or other substance into producing formations.
[[Image here]]
(m) To regulate the spacing of wells and to establish drilling units, including temporary or tentative spacing rules and drilling units in new fields.
The Act also authorized the Commissioner to establish drilling units. Section 8(b) of Act 157 of 1940 provided, in pertinent part, as follows:
For the prevention of waste and to avoid the drilling of unnecessary wells, the ^Commissioner shall establish a drilling unit or units for each pool,_ A drilling unit, as contemplated herein, means the maximum area which may be efficiently and economically drained by one well, and such unit shall constitute a developed area as long as a well is located thereon which is capable of producing oil or gas in paying quantities. (Emphasis supplied.)
Moreover, while the Act authorized the Commissioner to pool tracts, his authority to do so was limited by the constraints of Section 8(b). Section 9(a) of Act 157 of 1940 provided, in pertinent part, as follows:
When two or more separately owned tracts of land are embraced within a drilling unit which has been established by the Commissioner as provided for in Section 8(b), the owners thereof may validly agree to pool their interests and to develop their lands as a drilling unit. Where, however, such owners have not agreed to pool their interests, the Commissioner shall, if found by him to be necessary for the prevention of waste or to avoid the drilling of unnecessary wells, require such owners to do so and to develop their lands as a drilling unit.
In the instant case, the Commissioner issued three orders regarding the Miller No. 1 and 3 zones, which are relevant to our inquiry herein.
Order No. 97, which is dated May 21,1945, established drilling patterns for Miller No. 1, 2, and 3 zones.[3] Section 3(m) of Act 157 of _ 1940 specifically authorized the Commissioner “[t]o regulate the spacing of wells and to establish drilling units, including temporary or tentative spacing rules and drilling units in new fields.”
Order No. 97-A, which is dated May 13, 1947, approved a pressure maintenance system for Miller No. 1 and 3 zones. Section 3(j) of Act 157 of 1940 specifically authorized the Commissioner “[t]o regulate secondary recovery methods, including the | gintroduction of gas, air, water, or other substance into producing formations.”
Order 97-A-l, dated May 17, 1948, contained numerous findings and contained several orders. A portion of Order No. 97-A-l determined that special rules and regulations were required for the Miller No. 1 and 3 zones in order to regulate secondary recovery to prevent waste, to avoid the unnecessary drilling of unnecessary wells, and to obtain the greatest recovery of oil and gas. Order No. 97-A-l also determined that the Miller No. 1 and 3 zones were each a continuous sand body and that each reconstituted a single and complete pool and reservoir suitable for pressure maintenance. As noted above, Section 3(j) of Act 157 of 1940 specifically authorized the Commissioner “[t]o regulate secondary recovery methods, including the introduction of gas, air, water, or other substance into producing formations.”
In Order No. 97-A-l, the Commissioner also determined that it was necessary to pool and unitize the separate ownerships in the unit area to prevent waste, to protect correl *953 ative rights, to gain the greatest oil recovery, and to avoid the unnecessary drilling of unnecessary wells. Pursuant to this finding, the Commissioner ordered the unitization of the Miller No. 1 and 3 zones and pooled and integrated the separate ownership interests in those zones.
Pursuant to Act 157 of 1940, the Commissioner was authorized to create one unit for a small sand or pool that might be drained by one well. Section 8(b). However, a more substantial reservoir requiring more than one well for efficient drainage required the establishment of more than one unit. The Commissioner was not specifically empowered by the express language of Act 157 of 1940 to create forced drilling and production units which were required to be drilled by more than one well. Although the Commissioner was authorized by Section 8(b) to create forced unitized drilling and production units for each separate pool to prevent waste, his authority was limited to areas which could be |9drained by one well. Moreover, pursuant to Section 9(a), the Commissioner could force pool separately owned tracts embraced in a drilling unit, but only when the drilling unit had been established by the Commissioner pursuant to Section 8(b), which imposed the one-well limit on such drilling unit.
We note, however, that after the passage of Act 441 of 1960, the Commissioner was specifically empowered to order the unitization of any pool or a combination of two pools in the same field in connection with the institution, operation, and maintenance of pressure maintenance for secondary recovery. See LSA-R.S. 30:5C.
Although we are unable to find any jurisprudence that is helpful in resolving the issues presented in this ease, contemporary legal scholars recognized the limited powers of the Commissioner to force unitize under Act 157 of 1940 and the expansion of his powers to force unitize after the passage of Act 441 of 1960. In a Mineral Law Institute article, Thomas M. Winfiele noted that:
[Ujntil 1960, ... the Commissioner of Conservation was not expressly authorized, either for primary recovery or secondary recovery methods, to establish poolwide units. If the pool were small and could be efficiently and economically drained by a single well, the Commissioner could establish a unit comprised of the entire pool, but such a unit is not considered in the industry as a poolwide unit.
[[Image here]]
Insofar as secondary recovery operations are concerned, many poolwide units had been established in the state of Louisiana prior to the adoption of Act 441 of 1960. It was a necessary prerequisite, however, to the creation of such a unit that all interested landowners and leaseowners join in the unit agreement, and the Commissioner of Conservation then merely approved or modified the proposed program and blessed the unit agreement. A secondary recovery program cannot be considered or used unless a single unit comprised of the entire pool had been established. In the absence of a single poolwide unit, therefore, the injection of gas or water or other substances into a producing reservoir or the use of any other method of secondary recovery would create claims and counterclaims which could never be solved orjipsettled. I have been advised that it was often impossible to secure 100 per cent approval of a poolwide unit from the interested parties even for secondary recovery, and the leaseowners were forced to assume the risks and hope that the general authority granted to the Commissioner of Conservation to regulate secondary recovery programs included the authority to establish poolwide units in connection with such programs.
Winfiele, “New Legislation Relating to the Conservation Department,” 8th Min.L.Inst. 9, 10-11 (1961).
In a subsequent Mineral Law Institute article, W.J. McAnelly, Jr. noted that:
Prior to the passage of Act 441, the Commissioner of Conservation had the power under the original conservation act, Act 157 of 1940, to create forced unitized drilling and production units, as defined in R.S. 30:9B, for each separate pool. A drilling unit is defined as the “maximum area which may efficiently and economically be drained” by a single well completed in such *954 pool. The Commissioner also had the general power to regulate secondary recovery projects, and the specific power to require poolwide unitization for the purpose of gas cycling. Apart from this, the Commissioner was not given the express power to force unitize any reservoir as a single unit....
The need for an amendment to the conservation statute to authorize the unitization of large multi-well pools was apparent for many years prior to 1960. In 1949, the then Commissioner of Conservation, Mr. S.L. Digby, observed that the Commissioner’s power to regulate secondary recovery and to unitize for gas cycling were not “sufficiently strong and clear to indicate the Commissioner of Conservation should require the unitization or pooling of an entire reservoir in order that the reservoir be produced on a unit basis — which, in many instances, would undoubtedly result in a substantial increase in the ultimate recovery of the hydrocarbon content of the reservoir.” During this period from 1940 to 1960, to create such a unit for either primary or secondary recovery required voluntary agreement by all interested parties. (Footnote omitted).
McAnelly, “A Review of Poolwide Unitization Under Act 441 of 1960,” 15th Min.L.Inst. 3, 5-6 (1969).
After carefully considering all of the issues raised in this appeal, we find that the trial judge correctly determined that, under the law in existence at the time of the issuance of | nOrder No. 97-A-l, the Commissioner of Conservation was not authorized to create poolwide units. It is undisputed that the forced unitization of the Miller No. 1 and 3 zones would have prevented waste and would have been consistent with the express purpose of Act 157. However, prior to the passage of Act 441 of 1960, the Commissioner had only the powers to create forced unitized drilling and production units for each separate pool as set forth in Section 9(a) of Act 157 of 1940. The specific grant of power to issue orders: (1) to prevent wells from being drilled, operated, and produced in such a manner as to cause injury to neighboring leases or property; (2) to regulate secondary recovery methods, including the introduction of gas, air, water, or other substance into producing formations; and (3) to regulate the spacing of wells and to establish drilling units, including temporary or tentative spacing rules and drilling units in new fields cannot be read to expand the powers of the Commissioner to create compulsory poolwide units. It was not until the passage of Act 441 of 1960 that the Commissioner was given the express authority to order the unitization of any pool or combination of two pools in the same field for secondary recovery. Therefore, Order No. 97-A-l could not create a compulsory poolwide unit, and the Commissioner’s order could do nothing more than acknowledge the existence of and approve the conventional units created by the owners. As a result, the unit did not have to be dissolved by an order of the Commissioner, and the unitization agreements terminated in accordance with their express terms with the plugging, abandonment, and salvaging of the equipment in 1979. Thereafter, they were of no force and effect.
Intervenors alternatively argue that the Commissioner was authorized to create a unit out of the two pools pursuant to the authority granted him in Section 4(b) of Act 157 of 1940.
Section 4(b) of Act 157 of 1940 provided as follows:
In order to prevent waste, and to avoid the drilling of unnecessary wells, the Commissioner shall, after notice and upon hearing, determine the feasibility of and | i2require the re-cycling of gas in any pool or portion of a pool productive of gas from which condensate or distillate may be separated or natural gasoline extracted, and promulgate rules to unitize separate ownership and to regulate production of the gas and reintroduction of the gas into productive formations after separation of condensate or distillate, or extraction of natural gasoline, from such gas.
However, Intervenors’ reliance on this provision is not well-founded. While re-cycling of gas may have indeed been a benefit derived from the pressure maintenance system employed in the West Tepetate Field, as was the prevention of waste, the clear language of Order 97-A-l reveals that such order did not contemplate the re-cycling of gas in the West Tepetate Field, nor did the Commissioner require such.
*955 In conclusion, we recognize the inequities that may result to Intervenors by our affirmation of the trial court judgment in this case. However, as a court of law, we cannot legislate; we must interpret the law as promulgated by the legislature, despite the inequities that such interpretation may cause. Any endeavor to change the law must originate from the legislature. In fact, by enacting Act 441 of I960, the legislature alleviated the hardships which resulted from the Commissioner’s inability to force the unitization of poolwide units for cases occurring after the effective date of the 1960 Act. Unfortunately, the 1960 Act cannot be applied retroactively to provide relief to the intervenors in this case.

TERMINATION OF THE PRIVATE ROYALTY OWNERS’ AGREEMENT

In brief, Intervenors admit that the interpretation of whether the well was capable of producing in paying quantities is “irrelevant to the court’s determination of the effect” of Order No. 97-A-l. According to Interve-nors,
“[t]he private royalty owners’ agreement did not and could not create a reservoir-wide unit for the Miller No. 1 zone_
The private royalty owners’ agreement, by its express terms ‘shall be conformed to ... the valid orders and rules and regulations of the Conservation Commissioner of Louisiana’. Whether the private royalty owners’ agreement has or has not expired or terminated is, quite | ^simply, of no consequence. (Footnote omitted).
Because of our resolution of the previous issue, we find it unnecessary to address whether the well was capable of producing in paying quantities.

CONCLUSION

For the reasons set forth above, the judgment of the trial court is affirmed. The intervenors are cast for all costs.
AFFIRMED.

. Although we will not address each assignment of error individually, the opinion adequately disposes of all issues raised.

. The issue of prescription was before the court in this matter several years ago. Pursuant to a peremptory exception pleading the objection of prescription filed by Intervenors, the trial court overruled the exception on June 20, 1986. Thereafter, this court under docket numbers 86 CW 1057 and 86 CW 1009, ordered the trial judge to vacate the judgment overruling the objections of no cause of action and prescription and to enter judgment in relator’s favor dismissing the suit against him. Pursuant to writ applications, the Louisiana Supreme Court granted the writs, vacated the court of appeal judgment, and overruled the exception pleading the objection of prescription. See Eads Operating Company, Inc. v. Thompson, 498 So.2d 746-48 (La. 1986).

. The units for the Miller No. 3 zone were expressly dissolved by Supplemental Order to Order Nos. 97, 97-A, and 97-A-l on March 28, 1990. The units for the Miller No. 1 and 2 zones have not been expressly dissolved; however, the Miller No. 2 zone was not included in the uniti-zation agreements which were the subject of the two subsequent orders of the Commissioner.